## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**MIGDALIA VELEZ,**

     Plaintiff,

     v.                       Civil No. 15-1572 (BJM)

**COMMISSIONER OF SOCIAL
SECURITY,**
     Defendant.

## OPINION AND ORDER

Migdalia Velez ("Velez") seeks review of the Commissioner's determination that she is not disabled or entitled to benefits under the Social Security Act ("Act"), 42 U.S.C. § 423, as amended. Docket No. 1. Velez filed a memorandum of law supporting her position. Docket No. 21. Velez asks for judgment to be reversed and an order awarding disability benefits, or in the alternative to remand the case to the Commissioner for further proceedings.  Docket No. 1. The Commissioner answered the complaint, Docket No. 13, and filed a memorandum of law in support of her position. Docket No. 24. This case is before me by consent of the parties. Docket Nos. 4–9.  After careful review of the administrative record and the briefs on file, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982). In Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b).  At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments.  20 C.F.R. § 404.1520(c).  If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled.  If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity[1] ("RFC") and determines whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits.  20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability.  *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).  Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the

---

[1] An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1).

expiration of her insured status, or her date last insured.  *Cruz Rivera v. Sec'y of Health & Human Servs.*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

Velez applied for disability benefits on October 31, 2006, claiming that an emotional condition, pain, fibromyalgia, and migraines limit her ability to work. Transcript ("Tr.") 383. She alleges these conditions limit her ability to work because she "cannot concentrate nor retain anything," and there is "pain on [her] back, neck, arms, hands, and shoulders." *Id.*  She last met the Social Security Administration's ("SSA") insured status requirements on September 30, 2007 ("date last insured"). Tr. 16, 426, 436. The claim was denied initially on November 9, 2007, Tr. 256–59, and upon reconsideration on March 27, 2008. Tr. 262–64. Thereafter, Velez filed a timely written request for a hearing.

Velez was 37 years old at the onset date of disability, and 39 at the date last insured,[2] with above high school level of education (Tr. 387), but could not communicate in English. Tr. 382. She worked as a secretary and later as a teacher. Tr. 158–61, 384. However, her job as a secretary was more than 15 years ago and considered remote. Tr. 20. Velez alleged she stopped working on May 30, 2002, because she cannot concentrate or retain anything due to her nervous condition and pain. Tr. 383. At the hearing, Velez requested that the alleged onset date be amended to March 1, 2005, because there is an unfavorable prior decision by an ALJ, dated February 25, 2005, that is now final. Tr. 15; Docket No. 19 at 1.

The record shows a severe musculoskeletal condition prior to the onset date. Velez had work-related accidents and injured her lower and upper back, as per several diagnostic studies

---

[2] Velez was considered to be a younger individual (Tr. 28, 422), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(c).

performed. A CT scan of the lumbosacral spine in May 1992 indicated a bulging L4-L5 disc. Tr. 461. An MRI of the cervical spine in June 2002 further indicated a protrusion of L4-L5 and L3-L4 discs. Tr. 462. An MRI of the lumbar spine in December 2004 indicated a straightening of physiologic lumbar lorcosis compatible with muscle spasm and/or lumbar myositis, and L2-L3 and L4-L5 discs herniation. Tr. 463–64. She was diagnosed with right shoulder, cervical, and lumbar strain and received treatment at the State Insurance Fund ("SIF"). However, she had no surgeries or pain management. Tr. 471–75.

Velez was discharged from the SIF on March 21, 2005 ("the onset date"). The medical record on which the decision to discharge was based, dated March 31, 2005, indicated that Velez's dorsal and trapezium sprains were healed without disabling sequelae. Tr. 472. No other evidence in the record contradicts the conclusions of the SIF's decision that Velez's back conditions were healed without disabling sequelae.

During the period at issue, on October 2, 2006, Velez visited an emergency room due to low back pain. She was discharged with a prescription of Toradol and Norflex. Tr. 466–67. An MRI of the cervical spine on November 17 showed no evidence of disc herniation. Tr. 465.

***Fibromyalgia History***

Velez has alleged body pain beginning in 2003. Tr. 573. Dr. Annette Martinez-Quinones ("Dr. Martinez"), a treating rheumatologist, began seeing Velez on February 14, 2007. At this visit, Dr. Martinez reported Velez had fibromyalgia with 18/18 tender points and bilateral trapezius muscle pain. Velez complained of generalized pain and insomnia but was alert and active. Tr. 484, 575. She also reported a history of right shoulder and arm pain, fatigue, sleep disturbance, and paresthesia. Dr. Martinez found no neurological deficits, including sensory, motor, or reflex system deficits. Her diagnoses were cervical osteoarthritis and lumbar disc herniation at L2-L3 and L4-

L5 with levels of associated pain. Dr. Martinez recommended rest for three days, ice packs, low-impact exercises and aqua-aerobics, and prescribed Elavil. Tr. 574.

On the second visit in March, there was no improvement of pain but Velez's sleep was better. The same findings were reported in April with 18/18 trigger points. By June, Dr. Martinez reported some improvement of pain after prescribing Lyrica, but still some persistence of pain and associated numbness. Dr. Martinez diagnosed Velez with active fibromyalgia and findings during the subsequent visits in July and August show that Velez complained of persistent pain, in varying intensity. Tr. 576–77.

Progress notes of October 17, 2007, indicate that Velez was sleeping better and had some improvement in her body pain. Tr. 577. After this visit, Velez did not see Dr. Martinez until March 2008, after her insured status had expired. This is a gap of about five months without any treatment. There is no evidence Velez was taking any medications or receiving pain management during this period. After October 2008, there are no other progress notes. Tr. 459–475, 491–496, 573–581. The record does not contain any diagnostic study during the period under consideration, except the cervical MRI of November 17, 2006, that showed no evidence of disc herniation. Dr. Martinez's findings are in agreement with the findings of the MRI.

A function report completed by Velez on August 22, 2007, describes her daily and social activities and personal care. Tr. 170–77. She lives at home with her family. On a daily basis, she gets up, eats breakfast, watches television, then goes back to sleep. She then helps her family with some household chores, eats lunch, and lies down during the afternoon. Finally, she eats dinner and watches television. Tr. 170. She stated that before her illnesses and conditions she used to be able to work, have a social life, and partake in "very intense" family activities. Tr. 171. Her condition affects her sleep because the pains "do not let her sleep, even after taking the

medications." *Id.* For personal care, she needs help to get dressed, feels a lot of pain when caring

for her hair, and has to hold on to something to bend and stand up when using the toilet because of

the pain. *Id.* Her husband and children prepare the meals; she cannot because of the pain. Tr. 172.

She can do household chores "as long as they are simple," but her husband does the heavy chores.

*Id.* She goes shopping with her husband on a weekly basis. Tr. 173. She is unable to pay bills,

count change, handle a savings account, or use a checkbook/money orders because her "husband

has always done it." *Id.* She goes to church twice a week, but is laying down and resting almost

all of the time. Tr. 174–75. Her illness affects her ability to lift, squat, bend, stand, reach, walk, sit,

kneel, climb stairs, complete tasks, concentrate, and remember things.  Tr. 175. She can walk in

30-minute intervals before needing to rest because of the pain. She can pay attention for five

minutes. She follows written and spoken instructions, and gets along with authority figures "fine."

*Id.* She does not handle stress well; she "get[s] in a bad mood [and feels anxious and uneasy.]" Tr.

176. She does not need an assistive device to walk. *Id.*

        Dr. Hector R. Stella-Arrillaga ("Dr. Stella") conducted a consultative neurological

examination on September 18, 2007. Tr. 504–511. He reported that Velez had neck pain on flexion,

extension, and lateral movements; tenderness to palpation to both pectoral muscles; and limited

cervical range of movement. Tr. 505–06. He also reported tenderness to palpation to dorso

paravertebral and lumbosacral areas and decreased arc of movement. He said the lumbar pain

irradiated to the legs, but there were no sensory, motor, or reflex deficits. He found pain on her

heels and toes while walking, but no ataxic gait, 5/5 strength in the lower extremities, and adequate

sensory and motor systems, as well as reflexes. He observed Velez walking; she did not need an

assistive device. Dr. Stella found no hand limitations and Phalen and Tinel tests were negative

bilaterally. His diagnostic impression consisted of a cervical sprain, dorsal sprain, lumbo sacral

sprain, HNP L2-L3 and L4-S1, and severe major depression. Dr. Stella gave a poor prognosis. Tr. 506.

Dr. Stella reported that Velez was being treated by a rheumatologist; is taking Lyrica, Elavil, Lodin, Paxil, and Ambien; and has widespread pain throughout her body. But he did not report symptoms or assess a diagnosis of fibromyalgia at any time. Tr. 505–06.

Dr. Vicente Sanchez ("Dr. Sanchez"), a State Agency consultant, completed a physical RFC assessment on October 1, 2007. He opined Velez could perform medium work. She could lift and carry 25 pounds frequently and 50 pounds occasionally; and could stand, walk, and sit for six hours in an eight-hour workday. He also said Velez could frequently climb ramps, stairs, ropes, ladders and scaffolds, and could crawl and balance. Velez could occasionally stoop and crouch. Tr. 518–25.

On November 9, 2007, a Bone Study showed an enchondroma. Tr. 552. Regarding this study, Dr. Jorge Hernandez-Denton ("Dr. Hernandez"), a medical expert who testified at the hearing, indicated this is an incidental finding of a benign tumor. Tr. 81. Besides the Bone Study, there is no mention of this condition throughout the record. It required no treatment.

Dr. Idalia Pedroza ("Dr. Pedroza"), another State Agency consultant, also completed an RFC assessment on March 24, 2008. She indicated that Velez could perform light work: she could lift and carry 10 pounds frequently and 20 pounds occasionally, and could stand, sit, and walk for six hours out of eight. She added that Velez could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and could stoop and crawl occasionally. Tr. 562–70.

***Mental Condition History***

Velez started psychiatric treatment through the SIF on January 31, 2005. Dr. Rafael Rivera Perez ("Dr. Rivera"), a treating psychiatrist, evaluated her on three occasions in 2005, and once on

January 10, 2006. Tr. 180–84. Additionally, Dr. Aurea Cesar-Almanza ("Dr. Cesar) did a psychiatric report on January 27, 2005, Tr. 185–88, and Dr. Viviana Amador ("Dr. Amador") saw Velez once in February 2006. Tr. 191.

Dr. Rivera reported Velez continued experiencing pain in the L/S area 24 hours a day and felt pain in her cervical area and numbness in her arms and legs. Velez stated this situation keeps her depressed, anxious, with crying spells, irritable, and isolated. Tr. 183, 184. She has sleeping disorders and no desire to perform her daily activities. *Id.* Her thought process was in contact with reality, coherent, and pertinent, but the content revolved around her somatizations, self-deprecating ideas, low self-esteem, financial worries, and her state of health. *Id.* However, her mental status showed that she was well oriented in the three spheres, logical and coherent, with no mental blockings, and with adequate judgment and insight. She did not have nightmares or suicidal or homicidal ideas, delusions, or hallucinations. There were no perceptual disturbances, although she had problems with her recent memory. She had no problems with attention and concentration. She arrived to every appointment alone and was adequately dressed and clean. Tr. 180–81, 83–84. She was diagnosed with recurrent major depressive disorder without psychotic features. She was prescribed Wellbutrin, Tranxene, Flurazepam, and Neurontin. Tr. 180. Her prognosis was good. Velez was discharged from SIF on January 10, 2006, with the same clinical picture and the same medications. *Id.*

Dr. Cesar, a psychiatrist who evaluated Velez under the auspices of the SIF, commented that Velez's mental condition was secondary and not related to her organic impairment. She added that her physical condition did not have the magnitude to cause a severe mental illness that would require prolonged rest. Tr. 190. Dr. Cesar diagnosed Velez with major depressive disorder. *Id.*

The record indicates psychiatric treatment with Dr. Rodrigo Freytes ("Dr. Freytes"), a private health care provider, from March 2003 to November 2004, prior to the onset date. Velez had no treatment with Dr. Freytes in 2005 and resumed treatment from July 24, 2006 (three visits in 2006) until November 15, 2007 (seven visits in 2007). Tr. 554. Velez continued psychiatric treatment with Dr. Freytes after expiration of coverage, from January 2008 to May 2013, with sporadic visits yearly. Tr. 554–58, 583–96.

Dr. Freytes submitted several reports and medical source statements, in which he described Velez as depressed, with suicidal ideas, oriented only in person, with impaired memory, limited judgment and insight, and restricted interpersonal relationships and daily activities. He reported Velez had little interest in her personal hygiene, did not sleep well, and was overeating. He added that she was not making new social contacts and reacted with hostility and crying spells in stressful situations.  However, he stated Velez did not need supervision for common tasks.

Dr. Freytes diagnosed Velez with severe recurrent major depressive disorder with psychotic traits. Tr. 501, 558, 585. He assigned a Global Assessment of Functioning ("GAF") score of 40–45, defined by the global assessment of functioning scale of the DSM-IV as consistent with serious symptoms or serious impairments in social, occupational, or school functioning. He opined Velez had a poor prognosis and no ability to handle funds. Tr. 497–501, 554–58, 583–96.

Dr. Freytes completed a mental assessment of functioning on November 13, 2008. Tr. 583–89. He opined Velez had marked restrictions to understand, remember, and carry out simple instructions, and extreme limitations to carry out detailed instructions. Tr. 583–84. He also found marked limitations to interact with the public and respond to changes in a routine work setting. He reported extreme limitations to respond appropriately to work pressure in a work setting. *Id.* He stated that she is unable to maintain her job, work, or perform socially with her family, as she

spends her days using medication and lying in her bed most of the time, day and night. Tr. 586. He reported her psychomotor activity is below normal and self-depreciatory ideas, hopelessness, and ideas of physical impotence and worthlessness are present. Tr. 585. He opined Velez's condition had evolved into a major depressive disorder, recurrent and severe, with psychotic features. *Id.*

Dr. Concepcion Maldonado ("Dr. Maldonado"), a psychiatrist, conducted a consultative evaluation on October 13, 2007. Tr. 197–99. She described Velez as depressed, with slow psychomotor activity, flat affect, and diminished recent and immediate memory. Tr. 198. Nevertheless, she was oriented in the three spheres, coherent, logical, and had no major memory problems. Velez denied suicidal or homicidal ideas or hallucinations. *Id.* She did not have attention or concentration problems and her judgment and insight were adequate. She was able to perform simple math calculations. *Id.*

Regarding her daily activities, Dr. Maldonado reported that Velez watched television, performed house tasks, prepared simple meals, supervised her children in schoolwork, and washed clothes. Velez indicated her family relations were good; she went to church once or twice a week, went shopping with her husband if it was for a short time, participated in family activities, and indicated her sexual life was normal. She also drove short distances. Tr. 170–74, 198. The conclusion that Velez can frequently interact with the public, co-workers, and supervisors is supported by the fact that she had good relationships with family members, went to church and shopping with her husband, and participated in family activities. Tr. 198. Dr. Maldonado diagnosed mood disorder with depression secondary to organic condition as her primary diagnosis, and recurrent moderate major depression. Tr. 198. She opined Velez could handle funds.

The ALJ held a hearing on September 13, 2013, at which Velez (accompanied by counsel), Dr. Hernandez, Dr. June Jimenez ("Dr. Jimenez"), medical expert, and Pedro Roman, vocational

expert ("VE"), appeared and testified. During the examination by the ALJ, Velez reported she stopped working in 2002 due to the pains she suffers, which make it impossible for her to stand or sit for a long time. Tr. 77. Velez claimed she cannot work because everything hurts, "all [her] body hurts." Tr. 78. Her mother and children help in the house with the chores, and her son and husband drive her around.

Dr. Hernandez's testimony covered the fibromyalgia and body pain conditions. Tr. 79–86. Concerning Velez's lumbar and cervical complaints, he indicated that for the period to be considered (March 1, 2005 to September 30, 2007), Velez had lumbar pain irradiating to the legs, but she had no sensory or motor deficit and the reflexes were normal. Her gait was totally normal and she had good strength in both legs. Tr. 80. He indicated that Dr. Martinez found no neurological deficit or loss. *Id.* Dr. Hernandez added that Dr. Stella found cervical arc movement limitations, but the MRI of November 17, 2006, showed no herniated, slipped, or swelled discs. Tr. 79–81.

Dr. Hernandez indicated that the record shows Velez had a severe musculoskeletal condition prior to the established onset date, but it improved as of March 1, 2005, when she was discharged from the SIF. The medical improvement is confirmed by the findings of the cervical spine MRI, and Dr. Stella's findings when he examined Velez on September 18, 2007. Velez has not required any further medical treatment for her musculoskeletal condition. Tr. 83–84.

Regarding the fibromyalgia, Dr. Hernandez said that Velez was seen by Dr. Martinez since February 14, 2007. She diagnosed a fibromyalgia condition and prescribed Cymbalta and Lyrica. Tr. 81. However, Dr. Hernandez testified that she did not see Velez for many months until April 2008, thus there is little follow-up treatment during that period. *Id.*

Dr. Hernandez testified that Velez's physical conditions longitudinally do not meet or medically equal the criteria of any listing. Tr. 82. However, he opined Velez has limitations. She

can lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; and can sit, stand, and walk for six hours in an eight-hour workday. Regarding the postural limitations, he said Velez could occasionally climb stairs and ramps, balance and stop, and kneel, crawl, and crouch. She could never climb ladders, ropes, or scaffolds. She could frequently reach and do fine or gross manipulation. She could occasionally be exposed to wetness and extreme temperatures. Velez should never work around unprotected heights. Tr. 82–83.

When questioned by Velez's attorney, Dr. Hernandez indicated that he considered the MRI dated prior to the alleged onset date, but still determined that Velez's musculoskeletal condition did not meet or medically equal a listing. Tr. 83–84. There is no evidence of radiculitis or stenosis, and Dr. Hernandez explained he would need more evidence to classify the severity of the pain caused by the fibromyalgia. He reported the fibromyalgia might produce mild to moderate pain. However, the record does not contain any other longitudinal evidence to determine how Velez responded to her medications because the record of Velez's fibromyalgia condition stops after 2008 when she stopped seeing Dr. Martinez. He also stated that he could not say which condition Dr. Stella reported as having a poor prognosis: the fibromyalgia or the depression. Tr. 84–86.

Dr. Jimenez was called to testify at the hearing to indicate the emotional condition. Tr. 86–95. She considered the longitudinal evidence. She indicated that the medications Velez took while under SIF care (Wellbutrin, Tranxene, and Dalmane) were low dosages. Tr. 87. She indicated that the medications prescribed by Dr. Freytes (Paxil, Ambien, and Elavil) are not medications for psychosis and were prescribed in low dosages and never increased, constituting a drug regimen incongruent with Dr. Freytes's clinical findings. Tr. 89. And Dr. Freytes reported Velez had suicidal thoughts. Dr. Jimenez indicated that when a person verbalizes suicidal thoughts, the appropriate

treatment at the moment is to admit the patient into a hospital for stabilization. Tr. 93. Dr. Freytes did not do this.

Upon review of the entire medical record, Dr. Jimenez opined that Velez's major depressive disorder did not meet or medically equal any mental listing. Further, Dr. Jimenez indicated that Velez could perform simple and short tasks in a sustained matter, make simple work-related decisions, and maintain attention and concentration. The limitations would be mostly for complex and detailed tasks. Tr. 90. She stated that Velez should have two one-hour breaks, one in the morning and one in the afternoon, but that she could frequently interact with the public, co-workers, and supervisors, as well as complete a workday and workweek without interruptions and adapt to changes in the work setting. Tr. 90–91.

The VE also testified. Tr. 95–101. Velez's past work as a teacher was classified as light work. Tr. 95. Her transferable skills included proficient levels of verbal and written communication, and the ability to conference with parents/individuals if necessary, convey ideas, and instruct a class. Tr. 96. The ALJ asked a hypothetical question, inquiring whether an individual could be a teacher with the following limitations: the person can lift up to twenty pounds occasionally and ten frequently; stand, walk, or sit for up to six hours in eight; climb stairs and scaffolds occasionally; occasionally stoop at the waste and crouch; has no manipulative limitations but cannot be exposed to moving machinery or unprotected heights; has the ability to learn, understand, and execute simple instructions; keep pace and attention and persist in work tasks during the regular day or regular week with special attention or help; can adjust to changes of routine and work environments; and interact with the public, coworkers, and supervisors. The VE responded that was not possible, Tr. 97, but he indicated several jobs a person with those limitations could do, including teacher's aide, charge account clerk, and telephone quotation clerk. Tr. 98–99.

On October 27, 2013, the ALJ issued a decision denying Velez's claim for disability benefits. Tr. 15–29. The ALJ indicated that Velez had not engaged in substantial gainful activity during the period from March 1, 2005, through September 30, 3007, Tr. 17. Velez had the following severe impairments: disorders of the back (spondylosis, herniated nucleous pulposus at L2-L3 and L5-S1 level), fibromyalgia, and major depression. *Id.* Velez did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20. C.F.R. Part 404, Subpart P, Appendix 1. *Id.* The ALJ's RFC assessment found that she could perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b). She could lift, carry, push and pull up to 10 pounds frequently and 20 pounds occasionally. She could sit, stand, or walk for six hours in an eight-hour workday; climb stairs and ramps, balance, stoop, kneel, crawl, and crouch occasionally; but could never climb ladders, ropes and scaffolds. Additionally, she could perform simple and repetitive tasks; follow simple instructions in a sustained manner; make simple work-related decisions and maintain concentration for two-hour segments, with breaks, to complete a normal workday; and interact with public, co-workers, and supervisors frequently. Tr. 19. At Step Four, the ALJ found that Velez could not return to her past work, but at Step Five, the ALJ concluded that she could performed unskilled, repetitive, light, and sedentary work existing in significant numbers in the national economy (i.e., teacher's aide, charge account clerk, and telephone quotation clerk), Tr. 28–29, thus rendering her not disabled. Tr. 29.

The ALJ's decision considered both the medical-vocational guidelines and the VE's testimony, along with all the medical evidence in the record. In determining Velez's RFC, the ALJ stated that there was objective evidence of disorders of the back, fibromyalgia, and major depression. Tr. 17. The ALJ found that Velez's medically determinable impairments could reasonably be expected to cause the alleged symptoms (namely, severe body pain) but Velez's

statements concerning the intensity, persistence, and limiting effects of the pain, are not entirely credible to the extent they are inconsistent with the RFC finding. Tr. 27–28. Having found that Velez had the RFC to perform some light work, in conjunction with her age, education, work experience, and the VE's testimony, the ALJ determined that Velez was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, which directed to a finding of not disabled, as per Medical-Vocational Rule 201.18, 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00(e)(2), and 20 C.F.R. § 404.1569.  Tr. 28–29.

The Appeals Council denied Velez's request to review the ALJ's decision on March 12, 2015, rendering the ALJ's decision the final decision of the Commissioner. Velez subsequently filed this action in federal court. Tr. 1–3.

## DISCUSSION

This court must determine whether substantial evidence supports the ALJ's determination that Velez is not disabled within the meaning of the Act in light of her finding at Step Five that based on Velez's age, education, work experience, and RFC, there was work in the national economy that she could perform. Velez argues that the ALJ did not deploy the correct legal standards because she made mental RFC findings that did not clearly reflect the severity of Velez's limitations. Specifically, Velez argues the ALJ considered objective medical evidence when determining Velez's pain allegations were not credible, rather than giving controlling weight to Dr. Martinez's medical opinion. This alleged error formulated a defective hypothetical question presented to the VE, thus not complying with Social Security Ruling (SSR) 96-8p and the standard set out in *Arocho v. Secretary of Health and Human Services*, 670 F.2d 374 (1st Cir. 1982). Docket No. 19 at 12–14, 15–17. Velez also argues that the ALJ's consideration of her fibromyalgia within the confines of Listing 14.09(A) (inflammatory arthritis) was in error because the "ALJ effectively

was requiring evidence beyond clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines." Docket No. 19 at 14–15 (internal citations omitted). Finally, Velez argues that the ALJ's reliance on Dr. Maldonado's report, which detailed Velez's daily activities and ability to take care of personal needs without supervision, was improper. *Id.* at 22–23. Thus, Velez's primary concerns are with the ALJ's findings in regards to the fibromyalgia, not the mental condition. The Commissioner argues that there is substantial evidence in the record to support the ALJ's decision that Velez was not entitled to disability benefits and requests that her decision be affirmed.

The regulations require the ALJ to express a claimant's impairment in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho*, 670 F.2d at 375. "The ALJ [is] entitled to credit the vocational expert's testimony as long as there [is] substantial evidence in the record to support the description of [the] impairments given in the ALJ's hypothetical to the vocational expert." *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 429 (1st Cir. 1991). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). Additionally, ALJs "must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence," except for the ultimate determination about disability. 20 C.F.R. § 404.1527(e)(2)(1).

The ALJ was entitled to rely on the jobs identified by the VE only if the limitations in the hypothetical question accurately depicted Velez's actual work-related limitations. *Arocho*, 670 F.2d at 375. When determining which work-related limitations to include in the hypothetical questions, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine

what weight to assign the medical opinions and assessments of record. *See* 20 C.F.R. §§ 404.1527 (medical assessments must be supported by the medical record and evidence as a whole), 404.1529 (subjective complaints must be supported by the medical evidence and record as a whole.)

"Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.' Further, '[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities.'" *Johnson v. Astrue*, 597 F.3d 409, 410 (1st Cir. 2009) (per curiam) (citations omitted). The SSA acknowledges through SSR 12-2p that fibromyalgia may be a disabling condition, but there must be sufficient objective evidence to support a finding that a claimant's impairment(s) so limits her functional abilities that it precludes her from performing any substantial gainful activity. *Barowsky v. Colvin*, No. 15-cv-30019-KAR, 2016 WL 634067, at *4 (D. Mass. Feb. 17, 2016) (quoting SSR 12-2p (S.S.A.), 2012 WL 3104869, at *2). SSR 12-2p provides step-by-step guidance on how to evaluate fibromyalgia in disability claims. It also establishes the general criteria that a claimant (who has the burden of proof at Steps One through Four) may use to establish that she has a medically determinable impairment of fibromyalgia. The evidence provided must be from an acceptable medical source, and that evidence must not only contain the diagnosis (the policy specifically says that the SSA "cannot rely upon the physician's diagnosis alone"), but also a review of the claimant's medical history, physical exam(s), treatment notes consistent with the diagnosis, and an assessment of physical strength and functional abilities. SSR 12-2p, 2012 WL 3104869, at *2.

Velez quotes *Johnson*, arguing that once the ALJ accepted the diagnosis of fibromyalgia, "she also '*had no choice* but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms.'" *Johnson*, 597 F.3d at

414 (quoting *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)) (emphasis and alterations in original). But Velez's "argument seems rooted in the mistaken belief that the symptoms and signs of fibromyalgia are *per se* disabling." *Barowsky*, 2016 WL 634067, at *5 (quoting *Mariano v. Colvin*, No. 15-018 ML, 2015 WL 9699657, at *9 (D.R.I. Dec. 9, 2015)). The ALJ is required to consider all of the evidence on record when weighing Velez's subjective claims of pain to resolve conflicts in the evidence and draw reasonable conclusions from the record. *Barowsky*, 2016 WL 634067, at *5 (citations and quotations omitted).

Here, medical records indicate that Velez was first diagnosed with fibromyalgia by Dr. Martinez in 2007. The ALJ acknowledged the fibromyalgia diagnosis and considered the condition a severe impairment at Step Two. At Step Three, the ALJ indicated that although Velez had severe physical impairments, none of those impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). SSR 12-2 provides that "[fibromyalgia, "FM"] cannot meet a listing in Appendix 1 because FM is not a listed impairment. At [S]tep [Three], therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." SSR 12-2p, 2012 WL 3104869, at *6. Although Velez had disorders of the back, she did not have herniated nucleous pulposus or degenerative disc disease, resulting in a compromise of a nerve root or the spinal cord, or nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Tr. 18. Her fibromyalgia condition was not medically equivalent to inflammatory arthritis because although she had generalized body pain, there was no antalgic gait, no ambulating or disc disturbance problems, and no hand limitations. *Id*

Velez takes issue with the ALJ's consideration of fibromyalgia within the confines of inflammatory arthritis at Step Three, Docket No. 19 at 14–15, but this is exactly what the ALJ was required to do. Because fibromyalgia does not medically equate to any listed condition, moving to Step Four was valid.

Continuing to Steps Four and Five, SSR 12-2p provides that, when assessing the RFC of a claimant with fibromyalgia, the ALJ shall additionally "consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6. The longitudinal evidence in this case is limited in regards to Velez's levels of pain and response to medications. The record contains treatment and progress notes from Dr. Martinez, but they only span a few months, and include a five-month gap without any treatment or medication. There is no indication as to what occurred with her treatment after Velez's last visit in October 2008.

Velez takes issue with the limitations posed in the hypothetical question to the VE, arguing the limitations did not accurately represent the work-related limitations caused by fibromyalgia-induced pain. Velez argues the ALJ incorrectly looked for objective signs documenting Velez's fibromyalgia and that the ALJ did not provide, as required, good reasons for not giving controlling weight to the medical assessment from Velez's treating rheumatologist Dr. Martinez.[3] Docket No. 19 at 14–15. However, the medical record does not indicate Dr. Martinez gave a medical assessment of Velez's fibromyalgia condition. *See* SSR 96-2p, 1996 WL 374188 ("The opinion must be a 'medical opinion.' Under 20 C.F.R. §§ 404.1527(2) and 416.927(a), 'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only

---

[3] *See* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

opinions that may be entitled to controlling weight."). Dr. Martinez gave no actual medical assessment; rather, the record contained only treatment notes and a diagnosis. She did not issue a medical assessment of physical strength and functional abilities or an assessment of Velez's ability to perform work-related activities. There was a five-month gap in treatment by Dr. Martinez, and no notes after treatment indicating whether Velez was responding well to medications or improving longitudinally.

The ALJ instead gave great weight to Dr. Hernandez's medical opinion and adopted it in the RFC assessment, stating it is based on the longitudinal record, supported by the medical record, and there are no other assessments on record that contradict his opinion. Tr. 23. Dr. Hernandez noted, as discussed above, that Dr. Martinez did not see Velez for many months until April 2008, and so there is little follow-up treatment in that period. Tr. 80–81.  He also indicated that Dr. Martinez found no neurological deficit and the MRI of November 17, 2006, showed no herniated discs. Tr. 79–81. Dr. Hernandez finally testified that, including the limitations caused by fibromyalgia, Velez has work-related limitations consistent with the RFC finding in this case. The medical evidence shows that Velez's severe musculoskeletal condition prior to the established onset date improved as of March 2005, when she was discharged from the SIF, and she has not required any further medical treatment for this condition.

Non-examining State agency medical and psychological consultants and other program physicians and psychologists, like Dr. Hernandez and Dr. Pedroza, are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluations." 20 C.F.R. § 404.1527(e)(2)(i); *Berrior-Lopez*, 951 F.2d at 431 (ALJ may properly rely on a state-agency physician's assessment). Both state consultants, Dr. Pedroza and Dr. Sanchez, indicated that Velez could perform work with varying levels of limitation. The ALJ gave great weight to Dr. Pedroza's

medical opinion, stating it is more in agreement with Dr. Denton's medical opinion describing an ability to engage in light work with some postural imitations, which was afforded great weight because it considered the longitudinal medical picture. Tr. 23. The ALJ gave little weight to Dr. Sanchez's medical opinion because it did not consider Velez's reasonable allegations of pain or the documented evidence in the record that shows pain is a factor that would limit Velez's capacity to work at a light level of exertion. Tr. 23.

The ALJ afforded partial weight to Dr. Stella's medical opinion. Tr. 22. The ALJ found that Dr. Stella's findings (i.e., that Velez had no neurological deficits, no hand limitations, normal gait and strength, and ability to walk with no assistive device) are inconsistent with his opinion as to the poor prognosis. The ALJ stated, "[c]onsidering that the physical evaluation showed mostly unremarkable findings, and that the inconsistence as to the prognosis were not explained, this opinion is less persuasive towards a finding of disability." *Id.* However, his findings as to the absence of neurological deficits and hand limitations, and normal gait, strength, and ability to walk are consistent with Dr. Hernandez's assessment.

In sum, because Dr. Martinez issued no medical assessment of Velez's ability to perform work-related activities, the ALJ was not obligated to apply the factors for addressing a treating physician's medical assessment set forth in 20 C.F.R. § 404.1527(c)(2) and discussed above. Rather, the ALJ reasonably assigned great weight to the medical assessment from Dr. Hernandez because it "considered the longitudinal medical picture." Tr. 23. Credibility determinations "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." *DaRosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). Dr. Hernandez's medical assessment did not support Velez's subjective complaints that she was unable to perform work of any kind due to her

fibromyalgia. The medical evidence supports this finding. There are periods in time, particularly under Dr. Martinez's treatment, that Velez was not receiving any treatment or medication. A patient suffering from debilitating pain that she claims she feels all the time would presumably require some kind of treatment for the pain. Severe pain that Velez speaks of is not substantiated by objective diagnostic evidence, including an MRI that showed no disc herniation.  I find there was substantial evidence for the ALJ to adopt this finding in the RFC assessment, and that the hypothetical posed to the VE was an accurate depiction of Velez's work-related limitations. The ALJ compared Velez's subjective self-reported pain symptoms to the objective medical evidence available in the record and the consultative neurologist's physical evaluation and medical expert's professional opinion to determine whether her conditions could reasonably be expected to produce her pain and other symptoms, and I find that the record supports the finding that Velez's symptoms are not credible to the extent they are inconsistent with the RFC assessment.

Velez is also concerned with the ALJ's references to her activities of daily living, such as an ability to take care of her personal needs and do chores. Velez argues that these activities do not confirm an ability to work because the flexibility she has in scheduling these activities and the pace she can maintain while doing them would not translate to an ability to work full-time on a sustained basis.  However, these factors may be considered in determining disability, and evidence that a claimant's disorder does not seriously disrupt her daily life (ability to care for her own needs and do house chores) and social interaction may be used towards a finding that the claimant is not disabled.  *See Benda v. Bowen*, 684 F. Supp. 210, 211 (N.D. Ill. 1988).

The function of weighing evidence and determining if a person meets the statutory definition of disability is the Secretary's, 20 C.F.R. § 404.1527(d), and, as discussed in this opinion, there is substantial evidence in the record to support the ALJ's final determination.  The ALJ was

Velez v. Commissioner of Social Security, Civil No. 15-1572 (BJM)                    24

required to consider all of the evidence on record when weighing Velez's subjective claims of pain

to resolve conflicts in the evidence and draw reasonable conclusions from the record. *Barowsky*,

2016 WL 634067, at *5 (citations and quotations omitted).  While Velez "'plainly suffers from

fibromyalgia, the ALJ concluded, based on substantial evidence in the record, that it did not render

her disabled.  And, [she] supportably found that claimant's assertions to the contrary were not

entirely credible.'"  *Id.* (quoting *Hebert v. Colvin*, No. 13-cv-102-SM, 2014 WL 3867776, at *8

(D.N.H. Aug. 6, 2014)).  There is substantial evidence in the record to support the ALJ's final

determination.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 6th day of July, 2016.


*S/Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge